UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    Case No. 17-cr-20368

    HON. MARK A. GOLDSMITH

JIM TERRELL LATTNER,

    Defendant.
_____/

## OPINION & ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Dkt. 24) AND DEFENDANT'S MOTION TO SUPPRESS STATEMNTS (Dkt. 26)

This matter is before the Court on Defendant Jim Terrell Lattner's motion to suppress evidence (Dkt. 24) and motion to suppress statements (Dkt. 26). The Court held a series of evidentiary hearings on June 22, 2018; July 9, 2018; August 6, 2018; and August 27, 2018. Supplemental briefing followed. For the following reasons, both motions are denied.

### I. BACKGROUND

**A. The Shooting**

Around 7:25 on the morning of January 13, 2017, the Warren Police Department responded to a shooting that occurred in front of a home on Berghway Trail. See 6/22/2018 Tr. at 55 (Dkt. 38). Upon arrival at the scene, officers observed that Julii Johnson, the girlfriend of Defendant Jim Terrell Lattner, had been shot. See id. at 56. She died from her wounds that morning. Lattner was ruled out as a suspect in the shooting within a few weeks. See id. at 92.

Several officers quickly reported to the scene. Detective Daniel Bozek eventually became officer-in-charge of the investigation, 7/9/2018 Tr. at 10 (Dkt. 39), with Sergeant Charles Rushton acting as the co-officer-in-charge, 6/22/2018 Tr. at 55. Sergeant Christopher Livingston arrived at the scene about thirty minutes after the shooting, before departing to the Warren Police

1

Department station around 9:00 a.m. to prepare search warrant affidavits. Id. at 12-13. Also present were Sergeant James Wolfe, Officer Raymond Henke, and K-9 Officer Adam Sinutko.

Police began interviewing witnesses at the scene. Henke encountered Phyllis Brown, a neighbor, on the front porch of her residence. 7/9/2018 Tr. at 8. According to Henke's testimony, Brown told him that she heard gunshots, and then immediately went to look out her rear window. Id. at 10. She told him that she saw a man wearing a grey jacket with a hood running southbound, away from the scene of the shooting. Id. at 10-11. The officers on site observed that Lattner was wearing a jacket that was "very similar" to the description provided by Brown. 6/22/2018 Tr. at 64. A police dog track overseen by Officer Sinutko, based on the person that Brown saw running, resulted in a track back towards the initial incident. 7/9/2018 Tr. at 30.[1]

Wolfe also spoke to Brown around 9:30 a.m., nearly an hour after her initial conversation with Henke. According to Wolfe, Brown described that she saw a man dressed in a "grey hooded spring-type jacket" and who appeared to be around eighteen years old running southward. Id. at 81-82. Wolfe did not relay the information about the suspect's age to the officers-in-charge, believing that it was not "anything more than they had already had at the time." Id. at 84.

Having received Brown's initial statement from Henke, the two officers-in-charge (Bozek and Rushton) communicated with Livingston, who was already back at the police station to draft search warrant affidavits. Livingston was told that Lattner's jacket matched Brown's description. 6/22/2018 Tr. at 20. Livingston then drafted a warrant to search a pickup truck in Lattner's driveway – the approximate location of the shooting. See Search Warrant, Ex. 2 to Def. Mot. to Suppress Evidence (Dkt. 24-1). To support a finding of probable cause, Livingston averred that Brown told officers she "saw a male subject wearing a grey hooded sweatshirt" running southward

---

[1] Two non-police witnesses testified regarding the dog track. Thelma Chavois testified that she never saw the dog turn around and go back towards Lattner's house, 7/9/2018 Tr. at 179, and Dawn Brookins testified to the same, id. at 192.

2

away from the incident, that "Lattner was wearing a grey jacket which matched the description given by the witness Brown," and that the dog tracked back towards the incident from the location that Brown described seeing the man running. See Aff. for Search Warrant, Ex. 3 to Def. Mot. to Suppress Evidence (Dkt. 24-1). The warrant for the truck was sworn out around 11:00 a.m., 6/22/2018 Tr. at 38, and was received at the scene shortly after 12:00 p.m., id. at 94. Police impounded the pickup, as is standard procedure for the Warren Police Department. Id. at 95.

Phyllis Brown also testified at the evidentiary hearing, with her recollection of events diverging from that of the officers. Brown described that one of the officers asked her whether the jacket she saw the man wearing was light grey or dark grey, with Brown answering that it was dark grey. See 8/6/2018 Tr. at 22 (Dkt. 40). Brown also testified that Sergeant Wolfe "continuously" asked her whether the man she saw running was short or tall, with Brown responding that the person was not tall. See id. at 25; see also 8/27/2018 Tr. at 5, 9 (Dkt. 42). According to Brown, Wolfe "went all the way to my bedroom and looked out the window and told me to come to my bedroom to look out the window." 8/6/2018 Tr. at 25. Brown testified that Wolfe pointed to a person across the street and asked her if the runner was approximately that height. See id. at 24. Brown further testified that she did not know that person across the street; when asked specifically if it was Lattner, she did not provide a clear answer. See id. ("Q. Can you tell us if the person the officer pointed out to you was my client, Jim Lattner? A. Umm, it was to the back. The person that he pointed out to me, they back was turned to the back. They was standing to the back. Across the street, I only saw the back."). Wolfe, for his part, testified that Brown never provided a description of the runner's height and that he never asked her to take a look at Lattner. 7/9/2018 Tr. at 84.

**B. The Interview**

The following day, while the search of Lattner's pickup truck was ongoing, Rushton and Bozek met with Lattner at the Warren Police Department station. Lattner was told that he could go to the station to pick up his truck, 8/6/2018 Tr. at 69; when he arrived at the station, Bozek and Rushton took him to a private room and began asking him questions, id. at 71. Inside that room was an audio and video recording device that Lattner testified resembled a smoke detector. Id. at 72.

During the interview, Rushton and Bozek questioned Lattner about the previous day's events. See generally 6/22/2018 Tr. at 118-135; 7/9/2018 Tr. at 149-158. The interview took place in an interrogation room at the station, and lasted approximately one hour and forty-five minutes, with Rushton and Bozek occasionally stepping out. Id. Approximately seventy-five minutes into the interview, the detectives learned that a gun had been found in Lattner's truck. 6/22/2018 Tr. at 129. Approximately twenty minutes later, Lattner asked if he could speak to his sister, who had accompanied him to the police station. Id. at 136. At no point did Bozek or Rushton tell Lattner that any conversation in the interrogation room would be private, nor did Lattner ask that he be allowed to speak to his sister in private. Id. at 137. Lattner was allowed to speak to his sister, and, during that conversation, Lattner expressed concern that the police might have found a gun in the pickup truck. Id. at 138-139. No law enforcement officers were in the room at the time, id. at 139, nor was the interview being monitored at the time in a separate room, 7/9/2018 Tr. at 129.

**C. The Motions**

The police did, in fact, find a gun in the pickup truck, following which, Lattner was arrested. He is now charged with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Lattner filed two motions with the Court. The first motion (Dkt. 24) seeks to suppress

physical evidence seized pursuant to the seizure and search of his pickup truck, arguing that the affidavit in support of the warrant permitting that search and seizure contained false statements and/or was prepared with reckless disregard for the truth. The second motion (Dkt. 26) seeks to suppress Lattner's statements made to his sister, arguing that (1) he had a reasonable expectation of privacy and that the nonconsensual taping of his conversation with his sister violated the Fourth and Fourteenth Amendments; (2) the videotaping violated the Federal Wiretap Act; (3) the videotaping violated Michigan's eavesdropping statute; and (4) the videotaping violated Michigan's statute prohibiting the use of a computer network to commit a crime.

## II. ANALYSIS

**A. Search Warrant Affidavit**

Lattner's first motion argues that the weapon recovered from his pickup truck must be suppressed because it was seized pursuant to a defective warrant. Specifically, Lattner argues that Livingston, as the affiant, withheld from the issuing judge facts that would have made it clear that the person Brown saw running following the shooting was not Lattner. See Def. Supp. Br. to Mot. to Suppress Evidence at 12 (Dkt. 45). Lattner contends that the search warrant affidavit left out the detail that Brown described the runner as tall, as well as her telling Wolfe that Lattner was "definitely not the person she saw running by her house after the shooting." Id. Lattner also argues that Livingston provided the issuing judge with erroneous information regarding the dog track. Id. at 13.

Generally, a defendant is entitled to a hearing under Franks v. Delaware, 438 U.S. 154 (1978), if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause." United States v. Graham, 275 F.3d 490, 505 (6th Cir. 2001) (alteration in original) (internal quotation

marks omitted). The required showing is different when, as here, the defendant is claiming that the affiant failed to include relevant information in the warrant application. In such a case, the defendant is entitled to a hearing if he: (1) "makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit," and (2) shows that "a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it." United States v. Fowler, 535 F.3d 408, 415 (6th Cir. 2008). The bar for acquiring a Franks hearing is higher when a defendant is arguing a material omission, because of "the 'potential for endless rounds of Franks hearings' due to potentially 'endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" Id. at 415-416 (quoting United States v. Martin, 920 F.2d 393, 398 (6th Cir. 1990)). If, after a hearing, the defendant establishes that the false statement was made knowingly or with reckless disregard by a preponderance of the evidence and that the remainder of the affidavit, or the addition of new information, is insufficient to support probable cause, the search warrant must be voided and the fruits of that search suppressed. See Franks, 438 U.S. at 156.

Here, the Court concluded, after reading the submissions of the parties, that Lattner was entitled to a full evidentiary hearing on his contentions regarding alleged misrepresentations in, and omissions from, the affidavit in support of the search warrant. See 6/22/2018 Tr. at 7 ("I think there's been to me at least a sufficient showing to conduct an evidentiary hearing. . . ."). Having conducted a full evidentiary hearing, the Court concludes that Lattner did not prove by a preponderance of the evidence that Livingston, or any officers, engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit.

Lattner's strongest argument is that Brown clearly and definitively told Wolfe that the man she saw running was not Lattner when Wolfe pointed at Lattner through her bedroom window.

6

This argument would likely carry the day if it were supported by evidence presented at the evidentiary hearing; however, the testimony at that hearing did not substantiate Lattner's argument.

Brown was equivocal in her explanation of what occurred during her conversation with Wolfe. When asked if any police officer took her out to the front of her house and pointed someone out to her to ask if that person looked like the runner, Brown responded "[w]ell, I'm not remembering did he do that or not because it was a person across the street and that person was tall and he kept asking me does it look like that it was that height and I told him no, it was more my height." 8/6/2018 Tr. at 23-24. Brown was then asked whether she knew the person who was pointed out to her. She answered that she did not know because she had just moved to the area. Id. at 24. Then, despite testifying that she did not know who had been pointed out to her, she was asked whether the person was the defendant. She did not answer yes or no, instead answering that "it was to the back." Id. She later testified that she could not even recall whether the person was wearing a coat. Id. at 25. On re-direct, she testified that she never saw the face of the person who was pointed out to her, though the person did resemble the defendant "from the back." Id. at 44. When she was recalled to the witness stand to identify the officer who questioned her, she was asked if the officer asked her to look at a person standing outside who was wearing the jacket in question, she answered yes but then immediately clarified that "[t]he officer asked me to look out the bedroom window, um-hmm." 8/27/2018 Tr. at 5.

Brown's testimony does not establish that she definitively told Wolfe that Lattner was not the person she saw running; therefore, Lattner cannot show that Livingston omitted material information from the affidavit. While one view of the testimony might be that Wolfe pointed somebody out to her and asked her if that person was the person she saw running, her testimony did not clearly articulate that she had identified Lattner as that person – despite being asked

7

multiple times during her testimony. She testified that she only saw the person from the back, and never claimed that the person she saw was Lattner. Given the lack of a clear identification, the Court cannot find that Lattner has shown by a preponderance of the evidence that the officers engaged in a deliberate falsehood or reckless disregard for the truth.

The Court also finds that the officers did not engage in deliberate falsehood or reckless disregard for the truth when Brown's physical description of the man she saw running was not included in the affidavit. While it is true that "[t]he collective knowledge of agents working as a team is to be considered together in determining probable cause," United States v. Duval, 742 F.3d 246, 253 (6th Cir. 2014) (internal quotation marks omitted), Lattner has not shown by a preponderance of the evidence that the officers had the requisite intent to require suppression. Wolfe testified that he did not relay the information provided by Brown to Bozek and Rushton because he believed that it was not "anything more than they had already had at the time." 7/9/2018 Tr. at 84. This omission regarding the runner's age and height based on Wolfe's mistaken belief that Bozek and Rushton already knew that information is not accurately characterized as deliberate or reckless, but rather negligent or innocent. See United States v. Ayen, 997 F.2d 1150, 1153 (6th Cir. 1993) ("Defendant cannot succeed in his challenge to the search warrant by demonstrating non-material negligence, carelessness, and innocent mistakes.").

Finally, the Court determines that the evidence regarding the dog track is not sufficient to warrant suppression. The affidavit supporting the warrant application states: "Troy Pd [sic] K-9 was brought to the scene and did a track of the subject seen by Brown south on Heritage Parkway to a field of Cattails about 200 feet of the incident. The dog then tracked west back towards the incident, but the dog lost the track and was unable to locate the subject or the gun possibly used in the incident." Aff. for Search Warrant, ¶ 10.

8

The defense points to two non-police witnesses to show that the description in the affidavit was inaccurate: Thelma Chavois testified that she never saw the dog turn around and go back towards Lattner's house, 7/9/2018 Tr. at 179, as did Dawn Brookins, id. at 192. But those witnesses do not provide enough of a showing to overcome the "presumption of validity with respect to the affidavit supporting the search warrant." Franks, 438 U.S. at 171. Chavois described a chaotic scene and testified that she stayed for hours, 7/9/2018 Tr. at 181-182, but insisted that she recalled the dog's precise track, id. at 178-179. However, there were multiple dogs at the scene that morning, id. at 12, and Chavois could not remember any other canines being there, id. at 183. The Court does not find it credible that Chavois could remember the exact track of the canine unit in question in the midst of a chaotic scene when she could not remember the presence of other dogs. The other witness, Brookins, testified that the canine unit was "out of [her] visual" at a certain point, id. at 197; thus, she could not testify definitively that the dog never tracked back to the house. Because neither witness credibly counters the affidavit, the standard for suppression has not been met.

For these reasons, and because the evidence in the affidavit was sufficient to establish probable cause to search the truck,[2] Lattner's motion to suppress evidence (Dkt. 24) is denied.

---

[2] The warrant contains information that a person wearing clothing similar to Lattner was seen fleeing the scene. Given that, and given that an automobile would be a logical place to hide a weapon following a shooting, the affidavit contained sufficient evidence to establish probable cause. Lattner also argues that the seizure of the pickup truck was not authorized by the warrant. Lattner provides no case law to support his contention that a vehicle may not be seized when a warrant only allows a search, and does not grapple with the fact that the Warren Police Department has a procedure of impounding cars pursuant to search warrants before conducting the search, see 6/22/2018 Tr. at 95. Indeed, Lattner's opening brief merely argues "[t]his seizure and movement of the truck from the scene to the Police Department was not authorized by the Search Warrant, and was therefore illegal." Def. Mot. to Suppress Evidence at 3 (Dkt. 24). Accordingly, Lattner's argument is waived. See Aarti Hospitality, LLC v. City of Grove City, Ohio, 350 F. App'x 1, 14 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . Our law is well-settled that '[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting

**B. The Recording**

Lattner also argues that the audio and video recording of his conversation with his sister without his knowledge or consent violates various constitutional and statutory provisions, and thus seeks to suppress the statements made. The statements were recorded and taped using a device resembling a smoke detector.[3] These arguments are meritless.

**1. Fourth Amendment and Title III**

Lattner first argues that the police action violated his Fourth Amendment right to be free from unreasonable searches. Lattner also argues that the recording violated the Federal Wiretap Act, 18 U.S.C. §§ 2510-2522 (enacted as Title III of the Omnibus Crime Control and Safe Streets Act). The central question when a defendant alleges a Fourth Amendment violation is whether the defendant had "a legitimate expectation of privacy in the place searched or the thing seized." United States v. King, 227 F.3d 732, 743 (6th Cir. 2000). The Supreme Court has announced a two-part test for determining whether such an expectation exists: "First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.' . . . Second, we inquire whether the individual's expectation of privacy is 'one that society is prepared to recognize as reasonable.'" Bond v. United States, 529 U.S. 334, 338 (2000) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)). Put another way, the defendant must show that he had a subjective expectation of privacy

---

United States v. Sandridge, 385 F.3d 1032, 1035-1036 (6th Cir. 2004)). Regardless, the Sixth Circuit has allowed police to impound a car before searching it in other instances. See, e.g., United States v. Decker, 19 F.3d 287, 288 (6th Cir. 1994) ("The vehicles, although included in the search warrant, were not searched at this time but instead were taken to the FBI garage and impounded.").

[3] The Government contends the device has "features that distinguish it from a standard smoke detector, including having three-quarters of an inch of black all around it, having a larger size, lacking slots for the smoke, and lacking a push button to check the alarm." Gov't Supp. Br. to Mot. to Suppress Statements at 3 (Dkt. 49). It is unclear why the Government believes a layperson could make such a distinction when brought into a police interrogation room.

during the search, and that society would determine that expectation to be objectively reasonable. See California v. Ciraolo, 476 U.S. 207, 211 (1986). The same standard exists under Title III. See Dorris v. Absher, 179 F.3d 420, 425 (6th Cir. 1999) ("A person whose communication is illegally intercepted must have an expectation of privacy that is both subjectively and objectively reasonable.").

In Lanza v. New York, 370 U.S. 139 (1962), the Supreme Court considered a situation where the police surreptitiously recorded a conversation in a jail visiting-room between the defendant and his brother. Lanza later refused to answer questions in front of a legislative committee based on the secret recording. Lanza's conviction for refusal to answer questions before a legislative committee was upheld on independent grounds, but the Court also addressed in dicta whether the Fourth Amendment protected conversations that occurred in a jail's visiting room. The Court explained that "it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." Id. at 143. The Fourth Amendment does not protect an individual from being recorded in a jail.[4]

Various courts have considered whether the teachings of Lanza extend to police interrogation rooms as well. The California Supreme Court decided that Lanza did so extend in Donaldson v. Superior Court, 672 P.2d 110 (Cal. 1983). In that case, the defendant voluntarily went to the police station to be interviewed about a crime he witnessed. The defendant was brought

---

[4] Lanza was decided before the Supreme Court adopted the current two-prong test in Katz v. United States, 389 U.S. 347 (1967). However, courts considering the question whether Lanza remains good law have concluded that it does. See, e.g., United States v. Paul, 614 F.2d 115, 116 (6th Cir. 1980) ("It still appears to be good law that so far as the Fourth Amendment is concerned, jail officials are free to intercept conversations between a prisoner and a visitor. This was the ruling in Lanza, and it appears to have survived Katz.") (internal citations omitted); Donaldson v. Superior Court, 672 P.2d 110, 112 (Cal. 1983) (collecting cases); Belmer v. Commonwealth, 553 S.E.2d 123 (Va. Ct. App. 2001).

11

to an interrogation room where his brother was already being interviewed; the room had audio and video recording capabilities. The brothers were left alone in the room, at which time the defendant made incriminating statements. The court upheld the trial court's decision to deny a suppression motion. Id. at 112. The defendant argued that his case differed from Lanza because he was not in custody, but the court disagreed and concluded that Lanza stood for the proposition that there is no justifiable expectation of privacy "in detention facilities, regardless whether the particular defendant involved was detained or voluntarily present." Id.

The court in Belmer v. Commonwealth, 553 S.E.2d 123 (Va. Ct. App. 2001), also found that a conversation between family members in an interrogation room did not violate a reasonable expectation of privacy. There, the court observed that a police station's interrogation room is "designed for the disclosure, not the hiding, of information," while also noting that the police at no point suggested that a conversation could be had without fear of eavesdropping. Id. at 129. In short, the court in Belmer remarked that the defendant "had no reason to believe this interrogation room was a 'sanctuary for private discussions.'" Id. Because the police had done nothing to lull the defendant into a false sense of security, there was no reasonable expectation of privacy. Id. Other courts have found similarly. See, e.g., State v. Strohl, 587 N.W.2d 675, 682 (Neb. 1999) ("The greater weight of authority, however, has consistently followed Lanza and upheld the admission of monitored conversations in police stations, jail visiting rooms, or jail cells."); State v. Howard, 728 A.2d 1178, 1182 (Del. Super. Ct. 1998) ("For example, courts have generally found no 'reasonable expectation of privacy' for overheard or monitored conversations in police cars, police interview rooms, or in prisons.") (citing, among other cases, Donaldson, 672 P.2d 110); Napper v. United States, 22 A.3d 758, 768 (D.C. 2011) ("[C]ourts have held that individuals do not typically have a reasonable expectation of privacy in police interview rooms.").

Here, Lattner came to the police station voluntarily and sat for an interview related to the events of the day before. See Donaldson, 672 P.2d at 113 (holding that a person does not have a reasonable expectation of privacy at a police station, regardless of whether they are in custody or there voluntarily). After some time, he asked to speak to his sister, and he confided in her that he believed that the police had found a gun in his pickup truck. Rushton and Bozek did nothing to lull Lattner into a false sense of security; they never, for example, told him that they could speak privately or advised him that they were turning off any recording devices.[5] See Belmer, 553 S.E.2d 1123 at 129 (citing cases in which a reasonable expectation of privacy existed because police had given the impression that the defendant could speak privately to others). Accordingly, because society would not recognize a police interrogation room as a place where a person has a reasonable expectation of privacy and because Lattner had no reason to believe that the interrogation room was a "sanctuary for private discussions," Belmer, 553 S.E.2d at 129, Lattner's Fourth Amendment and Title III arguments fail.[6]

---

[5] Lattner cites Ohio v. Williams, No. 2012-T-0053, 2013 WL 6081535 (Ohio Ct. App. Nov. 18, 2013), to support his claim. In that case, the interrogation room contained no indicia that activity could be monitored or recorded; the recording device was hidden in a thermostat. Id. ¶ 38. This case differs, despite the hidden camera, because the interrogation room here was located in the midst of a police workspace with windows looking out into that area. Additionally, Rushton and Bozek were constantly coming into and out of the room, so Lattner should have expected to be interrupted and overheard at any time. Further, Lattner and his sister's hushed tones show that they were wary of being overheard, cutting against the argument that they had an expectation of privacy. Lattner also cites North v. Superior Court, 502 P.2d 1305 (Cal. 1972), but that case hinged on the fact that the recorded conversation was between husband and wife, a protected relationship. No such relationship is present in this case. Lattner cites two Michigan cases as well, but one – People v. Patrick, 208 N.W.2d 604 (Mich. Ct. App. 1973) – relates to a conversation recorded at a home, while the other – People v. Tebo, 194 N.W.2d 517 (Mich. Ct. App. 1971) – relates specifically to phone calls. Neither circumstance is at issue here.

[6] Lattner also "argues" that the police violated his Fourteenth Amendment right to privacy. However, Lattner only cites the applicable standard, then says it applies in this case without any further analysis. When a moving party presents such a perfunctory argument, the issue is deemed waived. See Aarti Hospitality, 350 F. App'x at 14. Accordingly, even though the Government did not even offer a response to Lattner's argument, the Court denies relief on this ground.

### B. Michigan Eavesdropping Statute

Lattner also argues that the police conduct violated Michigan's eavesdropping statute, Mich. Comp. Laws § 750.539 et seq. Lattner argues that the interrogation room became a "private place" under the statute once Bozek and Rushton left, and thus the recording was contrary to law and requires suppression of the statements. He contends that three provisions of the statute were violated: (i) Mich. Comp. Laws § 750.539c, prohibiting eavesdropping on a private conversation without consent; (ii) Mich. Comp. Laws § 750.539d(1)(a), prohibiting the installation, placing or use in any private place, without the consent of those entitled to privacy in that place, any device for observing, recording, transmitting, photographing, or eavesdropping upon the sounds or events in that place; and (iii) Mich. Comp. Laws § 750.539d(1)(b), prohibiting the distribution, dissemination, or transmission for access a recording, photograph, or visual image the person knows or has reason to know was obtained in violation of the provision. Lattner's argument fails for two reasons.

First, the eavesdropping statute expressly exempts law enforcement officials from its provisions, provided that the officials are not violating any other law. See Mich. Comp. Laws § 750.539g(a) ("Sections 539a to 539f do not prohibit . . . [e]avesdropping or surveillance not otherwise prohibited by law by a peace officer of this state or of the federal government, or the officer's agent, while in the performance of the officer's duties."); see also People v. Stone, 621 N.W.2d 702, 705 (Mich. 2001) ("[O]ur definition of 'private conversation' emanates from our eavesdropping statutes, which, by their own terms, do not apply to law enforcement personnel acting within their lawful authority."). Lattner contends that the exception does not apply because the officers violated the Fourth and Fourteenth Amendments and Title III. See Supp. Br. to Mot. to Suppress Statements at 9. However, as explained above, there was no violation of federal law; additionally, the recording was clearly made in the performance of police duties. Therefore, the

exemption enumerated in Mich. Comp. Laws § 750.539g(a) applies. There is no violation of the statute.

Second, even if the exemption did not apply, the interrogation room is not a private place under the statute, nor was the conversation between Lattner and his sister a "private conversation." The statute defines "private place" as "a place where one may reasonably expect to be safe from casual or hostile intrusion or surveillance but does not include a place to which the public or substantial group of the public has access." Mich. Comp. Laws § 750.539a(1).[7] A "private conversation" is one that "a person reasonably expects to be free from casual or hostile intrusion or surveillance." Stone, 621 N.W.2d at 705. The Michigan courts have explained that in order to qualify as a private place, "the area must be one in which a reasonable person would expect not to be disturbed by the appearance of another person or be subject to surveillance [and] [t]he area also must not be one to which the general public has access." Lewis v. LeGrow, 670 N.W.2d 675, 684 (Mich. Ct. App. 2003) (alterations in original) (internal quotation marks omitted). It should not surprise anybody that they might be subject to surveillance in a police station, especially in an interrogation room. Whether the ultimate purpose is police safety or the collection and memorialization of information, a reasonable person would expect that police would be keeping a close eye on the goings-on of their stationhouse. Accordingly, the interrogation room does not qualify as a "private place" under the Michigan eavesdropping statute, nor does the conversation qualify as a private one.[8]

---

[7] The Michigan Supreme Court has specifically not incorporated Fourth Amendment jurisprudence into the statute. See Stone, 621 N.W.2d at 705.

[8] Because the police did not violate the eavesdropping statute, Lattner's argument that the police violated Michigan's statute prohibiting the use of a computer network to commit a crime, Mich. Comp. Laws § 752.796(1), also fails. As there is no underlying crime, the statute cannot be violated.

15

## III. CONCLUSION

For these reasons, Lattner's motion to suppress evidence (Dkt. 24) and motion to suppress statements (Dkt. 26)[9] are denied.

SO ORDERED.

Dated: November 20, 2018           s/Mark A. Goldsmith
       Detroit, Michigan            MARK A. GOLDSMITH
                                  United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 20, 2018.

                                                                                     s/Karri Sandusky
                                                                                     Case Manager

---

[9] In his initial motion, Lattner also argues that his statements should be suppressed because he was not advised of his Miranda rights. See Def. Mot. to Suppress Statements at 3. This argument is not addressed in his brief and he provides no further explanation, so the issue is waived. See Aarti Hospitality, 350 F. App'x at 14. Regardless, the statement Lattner seeks to suppress was made to his sister, and there is no indication that the police instructed her to elicit incriminating statements from him. Accordingly, the Miranda protection does not apply. See Arizona v. Mauro, 481 U.S. 520 (1987) (holding that it is not interrogation or its functional equivalent when police allow a defendant's wife to speak to him following his request for counsel).